IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MALCOLM MUHAMMAD,        )
                                   )
     Plaintiff,             )       Civil Action No. 7:22cv00106
                                   )
v.                          )       **MEMORANDUM OPINION**
                                 )
ISRAEL HAMILTON, *et al.*,      )       By:   Hon. Thomas T. Cullen
                                 )            United States District Judge
     Defendants.        )

Malcolm Muhammad, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983, against Warden Hamilton, Regional Administrator Manis, and Office Services Specialist ("Specialist") Smith,[1] alleging that he was denied adequate medical treatment while housed at Keen Mountain Correctional Center ("Keen Mountain"). This matter is before the court on the defendants' motion for summary judgment.[2] Having reviewed the record, the court will grant the defendants' motion.

---

[1] Muhammad identifies defendant Smith as a Nurse, but Smith avers that she is the Specialist in the medical department at Keen Mountain Correctional Center. (*See* R. Smith Aff. ¶ 1, Jun. 6, 2022 [ECF No. 33-1].) Because it is unclear whether Smith is a nurse, the court will refer to her as Specialist Smith throughout this opinion.

[2] Muhammad has also filed motions seeking entry of default judgment and reconsideration of earlier denials of default judgment, based on the defendants' untimely responses to his discovery requests. (*See* ECF Nos. 61, 66, &70.) Counsel for the defendants states that the failure to respond was an unintentional oversight and she has now responded to those requests (and did so before Muhammad was required to respond to the defendants' motion for summary judgment). (*See* ECF No. 62.) The court finds no basis to enter default judgment and, therefore, will deny Muhammad's request for this drastic sanction.

# I.

## A. Muhammad's complaint and evidence

Muhammad alleges that, on July 28, 2021, the right arm screw of his eyeglasses came out. On that same day, he claims he submitted the eyeglasses, wrapped in a medical request form, to the medical department, requesting that they be repaired.

On September 28, 2021, after filing "several" unanswered medical requests about the eyeglasses[3] and a pill-call nurse telling him that she had given the eyeglasses to Specialist Smith, Muhammad filed a written complaint[4] concerning the repair delay. (Compl. at 2 [ECF No. 1].) On October 7, 2021, Specialist Smith responded to the written complaint and informed Muhammad that "replacements ha[d] been ordered," they were waiting for shipment, and that he would be notified once they arrived. (*Id.*)

On November 9, 2021, Muhammad filed another written complaint requesting his eyeglasses and explaining that it was "hard for him to read correctly" without his eyeglasses. (*Id.*; ECF no. 71-3 at 2.) One week later, Specialist Smith responded and stated that "all glasses come from VCE Optical, [Muhammad's] glasses ha[d] been ordered, [and] once [the prison] submit[s] the order, it [is] up to VCE Optical on how long it takes." (*Id.*)

Muhammad claims that "one time" on November 12, 2021, his vision was "significantly blurred," which caused him to become dizzy, lose his balance, and fall on his knee "into the toilet." (Supp. Compl. at 1 [ECF No. 22].)

---

[3] The court notes that Muhammad did not submit copies of these allegedly unanswered medical requests to the court.

[4] Written complaints were previously called informal complaints in the Virginia Department of Corrections' Operating Procedures. Muhammad uses the term "informal complaint" in his pleadings, but the actual forms he submitted are titled "Written Complaint." The court will use the term "written complaint" in its opinion.

On November 18, 2021, Muhammad filed a regular grievance, complaining that it had been over 120 days since he turned his glasses in "to be fix[ed]." (Compl. at 3; ECF No. 71-3, at 3.) Warden Hamilton responded to the grievance, stating that Registered Nurse ("RN") Whited had advised him that "[u]pon review of [Muhammad's] medical record, [his] frames ha[d] been ordered and received," however, "VCE [Optical] sent the wrong frame[s]," and Muhammad would be "rescheduled to see the eye doctor to obtain the proper size and prescription." (ECF No. 71-3 at 5.) Warden Hamilton determined that there was no violation of policy or procedure and deemed the grievance unfounded. Muhammad states that he "never received any glasses with wrong frames and VCE [Optical] already [had his] eye medical records, size[,] and what prescription [he] was prescribed [and,] therefore, there [was] no need to obtain size and prescription" from another eye examination. (Compl. at 3.) Muhammad argues that Warden Hamilton failed to "take responsibility and concern" for Muhammad being without his eyeglasses for over 120 days, while suffering "watery [eyes], blurriness, strain[ed] eyes, and [not being able to] see close-up." (*Id.*)

On January 14, 2022, Muhammad appealed the grievance decision and stated that he was still waiting for his prescription eyeglasses, he bought a pair of commissary glasses, but his eye "run water, they [are] red, [and he has] to wipe [his] eyes every 5 min[utes]." (ECF No. 71-3 at 8.) He further stated that without glasses, he has pain in his eyes. Muhammad alleges that Regional Administrator Manis determined Muhammad's appeal was "unfounded" despite having "full knowledge of [his] injuries." (Compl. at 3.) He also alleges that he has to "use the sun light and write beside the window [while] using glasses that [are] not prescribed for [him]." (*Id.*)

- 3 -

On February 7, 2022, Muhammad submitted another written complaint concerning the delay in receiving his eyeglasses. Three days later, during pill-call, a non-defendant nurse gave Muhammad a pair of eyeglasses and asked him to sign a form, verifying that they were received. After he returned to his cell, Muhammad claims that he noticed that they eyeglasses were not prescribed for him because "on the lens of the glasses, it had the words printed 'Demonstration only.'" (*Id.* at 4.) On February 11, Muhammad submitted a written complaint concerning the "misconduct" by Specialist Smith in providing Muhammad with demonstration eyeglasses. (*Id.*) Along with the complaint, Muhammad returned the demonstration eyeglasses. Muhammad states that he then bought "commissary glasses that [were] not prescribed for his eyes." (*Id.*) In response to the written complaint, Specialist Smith stated that demonstration glasses were given to him "by mistake." (ECF No. 71-3 at 16.)

Later that same day, on February 11, 2022, Muhammad saw the eye doctor. Muhammad claims that the doctor stated that going without prescription eyeglasses "for this long period" caused eye strain, blurry vision, and red eyes. (*Id.*) At the eye examination, the doctor determined that while Muhammad's prescription for his left eye had remained the same (+2.50), his prescription in his right eye had increased from +2.25 to +2.75, since his last exam in April 2021.[5] (ECF No. 71-3 at 22 &24.) The eye doctor informed Muhammad that his new eyeglasses could take up to three months to arrive. On April 5, 2022, Muhammad received his new eyeglasses. (ECF No. 71-3 at 26.)

---

[5] After wearing his new prescription eyeglasses for more than five months, he had another eye examination on September 11, 2022, and his prescription changed from +2.50 to +3.00 in his right eye, and from +2.75 to +3.25 in his left eye. (ECF No. 71-3 at 30.)

**B. Defendants' motion for summary judgment and evidence**

In support of their motion for summary judgment, the three defendants, as well as RN Whited, the Health Authority at Keen Mountain, provided affidavits and exhibits. (*See* ECF Nos. 33-1−33-4.) Specialist Smith avers that when Muhammad's eyeglasses were received by the medical department, the arm was broken and not just missing a screw and, therefore, new frames had to be ordered. The only VDOC-approved provider of eyeglasses is VCE Optical. Smith states that, although there is no documentation reflecting when the eyeglasses were received by the medical department, it is her "habit and practice" to order new glasses within a few days of the receipt of the old glasses. (R. Smith Aff. ¶ 4, Jun. 6, 2022 [ECF No. 33-1].)

Specialist Smith attests that Muhammad's frames were ordered from VCE Optical on October 8, 2021.[6] Smith states that Muhammad's eyeglasses were received in "early November of 2021," but the new frames could not fit the lenses from his prior glasses. (*Id.* ¶ 8.) Muhammad was notified, in a regular grievance response, of this discrepancy and advised that he would be scheduled to see the eye doctor to obtain the proper size and prescription. Smith avers that on February 9, 2022,[7] Muhammad was erroneously given replacements frames with clear plastic lenses. Smith states that the frames that were shipped from VCE Optical came with the clear plastic lenses (since they anticipated that the plastic lenses would be replaced by the prescription lenses from Muhammad's old glasses), and "[s]omeone in medical mistakenly thought these were his replacements glasses and delivered them to him." (*Id.* ¶ 10.)

---

[6] The order for the frames was prepared on October 7, 2021, but "due to technical issues," the order was not sent to VCE Optical until October 8, 2021. (*Id.* ¶ 6.)

[7] The court notes that Muhammad states that he received these glasses on February 10, 2022. Whether the glasses were received on February 9 or 10 is immaterial to the court's analysis.

Because Muhammad's old eyeglass frames were broken and the new frames could not fit the old lenses in them, Muhammad was scheduled to see the eye doctor to be reevaluated for a completely new eyeglasses order. According to Specialist Smith, the eye doctor typically visits Keen Mountain every two months, but due to multiple COVID-19 lockdowns during September through February, the eye doctor did not visit Keen Mountain until February 2022.

On February 11, 2022, Muhammad was seen by the eye doctor and new eyeglasses were ordered. Specialist Smith avers that Muhammad's new eyeglasses were received at Keen Mountain on March 10, 2022, and she "immediately delivered them to one of the pill-call nurses to take to Muhammad in his housing unit." (*Id.* ¶ 12.) Smith states that she is "not sure what happened and why they were not given to Muhammad on March 10, 2022," but that once "this error was discovered, Muhammad was brought to medical and given his glasses on April 5, 2022." (*Id.*)

Warden Hamilton attests that, although he responded to Muhammad's November 18, 2021 regular grievance complaining about the delay in receiving his replacements eyeglasses, he was not—and is not—involved in the process of ordering or distributing eyeglasses. Hamilton asserts that his response to the regular grievance was based on his review of information provided to him by staff as well as the policy governing the issue, and he relies on the health care providers at Keen Mountain "to make all treatment decisions and manage any health care related issues with the inmates directly." (I. Hamilton Aff. ¶ 11, Jun. 7, 2022 [ECF No. 33-2].) Hamilton states that the Keen Mountain's Health Authority, RN Whited, reviewed Muhammad's medical records and advised the Warden that eyeglass frames had been ordered and received, but VCE Optical had sent the wrong size frames back and that Muhammad

would be rescheduled with the eye doctor to obtain the proper size and prescription for new eyeglasses. Warden Hamilton felt that the information provided by the medical department "clearly demonstrated they had the issue under control and were aware of the issues with Muhammad's glasses." (*Id.* ¶ 7.) Warden Hamilton also states that reading eyeglasses are available for purchase from the commissary, with prescriptions up to +2.25, and commissary records show that Muhammad ordered reading glasses in 2014 and again in 2020. These reading eyeglasses were also available while Muhammad waited for his new prescription eyeglasses from VCE Optical.

Regional Administrator Manis states that he provided the response to Muhammad's January 14, 2022 grievance appeal concerning the delay in receiving his replacement eyeglasses, but that he was not involved in the process of ordering or distributing eyeglasses. Manis asserts that his response to the grievance appeal was based on information provided to him by staff as well as the policy governing the issue, and he relies on the health care providers at Keen Mountain "to make all treatment decisions [and] handle all medical care issues. . . ." (C. Manis Aff. ¶ 9, Jun. 2, 2022 [ECF No. 33-4].) He also avers that he "do[es] not make any decisions regarding inmates' medical treatment." (*Id.*)

Finally, RN Whited avers that he reviewed Muhammad's medical records and found no evidence that Muhammad had submitted any medical complaints or emergency grievances regarding headaches, watery eyes, injuries, or other ocular issues from July 2021 to April 2022. In addition, Whited states that Muhammad was not seen in the medical department for any medical conditions because he did not have his eyeglasses. Whited explains that Muhammad

was diagnosed with "mild nearsightedness."[8] (E. Whited Aff. ¶ 3, Jun. 6, 2022 [ECF No. 33-3].) When Muhammad was examined in February 2019 and April 2021, "his exams showed +2.25 in the right eye and +2.50 in the left eye." (*Id.*) At his most recent eye examination in February 2022, it "showed +2.75 in the right eye and +2.50 in the left eye." (*Id.*)

### C. Muhammad's response in opposition

Muhammad provides an affidavit in support of his response in opposition to the defendants' motion for summary judgment. In it, he largely reiterates claims and arguments made in his verified complaint. He asserts that he has been "diagnosed with a moderate condition of nearsightedness."[9] (M. Muhammad Aff. ¶ 1 [ECF No. 71-2].) He also stresses that, when he initially submitted his eyeglasses to the medical department, the arm was not broken and instead only missing a screw. Muhammad also asserts that Keen Mountain "was NEVER lock[ed] down completely due to COVID," and argues that "even if the ophthalmologist was not able to visit, it did not stop the shipping or mailing" to and from Keen Mountain. (*Id.* ¶ 10.) Muhammad does not dispute that he saw the eye doctor the first time the eye doctor visited Keen Mountain after his eyeglasses needed to be replaced. He also notes that, although Warden Hamilton and Administrator Manis are "not medical providers," they "have full responsibility to oversee their operations. . . ." (*Id.* ¶ 18.)

---

[8] Although the parties both refer to Muhammad as nearsighted, his prescription actually indicates that he is farsighted. Daniel Porter*, How to Read an Eyeglasses Prescription*, American Academy of Ophthalmology (Apr. 18, 2023), *available at* https://www.aao.org/eye-health/glasses-contacts/how-to-read-eyeglasses-prescription (last visited Sept. 20, 2023.)

[9] The court notes that Muhammad did not submit any medical records to support his assertion of this diagnosis. The only medical record concerning his prescription is the result of his eye exam which shows that he is farsighted. (ECF No. 71-3 at 30.)

**II.**

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (internal citations omitted).

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315−16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World*

- 9 -

*Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider

inadmissible hearsay in an affidavit filed with motion for summary judgment).

Although the court does not make credibility determinations when adjudicating a

motion for summary judgment, "[w]hen opposing parties tell two different stories, one of

which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

court should not adopt that version of the facts for purposes of ruling on a motion for

summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*,

550 U.S. 372, 380 (2007)).

**III.**

Muhammad argues that Warden Hamilton and Regional Administrator Manis were

deliberately indifferent to his serious medical need for prescription eyeglasses. But Muhammad

does not allege that they were personally involved in delaying his receipt of the eyeglasses.

Instead, he concedes that Hamilton and Manis are not medical providers and, instead, seeks

to hold them accountable as supervisors.[10]

---

[10] To the extent Muhammad claims that these defendants "did nothing" in response to his complaints (Compl. at 5), the court notes that each of them investigated Muhammad's claims by obtaining information from medical personnel and provided grievance or appeal responses to Muhammad. It is well-established that a response to a grievance or appeal, without more, does not give rise to a constitutional claim. *Johnson v. Clarke*, Civil Action No. 7:20cv717, 2021 U.S. Dist. LEXIS 74309, at *5−7 (W.D. Va. Apr. 19, 2021); *Brown v. Va. Dep't of Corr.*, No. 6:07cv33, 2009 U.S. Dist. LEXIS 3022, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009) ("[T]here is no liability under § 1983 for a prison administrator's response to a grievance or appeal."). "Only persons who cause or participate in the violations are responsible. Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) (internal citations omitted); *see also Graham v. Aponte*, No. 1:08cv308, 2009 U.S. Dist. LEXIS 7309, 2009 WL 249779, at *4 & n.4 (E.D. Va. Feb. 2, 2009) (finding no deliberate indifference on part of defendant whose only involvement was responding to plaintiff's request for administrative remedy); *Gupton v. Wright*, No. 7:15cv214, 2016 U.S. Dist. LEXIS 14730, 2016 WL 524656, at *3 (W.D. Va. Feb. 8. 2016) (opining that § 1983 claims "concern[ing] nothing more than the responses" individual defendants "made to [plaintiff's] grievances and appeals. . . do not implicate any constitutionally protected right").

Muhammad's claims of supervisory liability against Warden Hamilton and Regional Administrator Manis fail. It is well established that a supervisory government official cannot be held liable under § 1983 for the actions of his subordinates solely on the basis of *respondeat superior. Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978). Nonetheless, a supervisory official may be liable for his subordinate's acts if the supervisor himself bears personal responsibility for those acts. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Liability in this context is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

To prevail on a claim for supervisory liability, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that [his] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Establishing a "pervasive" and "unreasonable" risk of harm under the first element requires evidence that the conduct is widespread, or at least has been used on several different occasions, and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. *Slakan*, 737 F.2d at 373−74. A plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the

face of documented widespread abuses." *Id.* at 373. Overall, "[t]he plaintiff . . . assumes a heavy burden of proof in supervisory liability cases," for "[h]e must not only demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" *Id.* at 372 (quoting *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)) (alteration in original). "[H]e cannot satisfy [this] burden of proof by pointing to a single incident or isolated incidents." *Id.*

Muhammad's allegations do not establish the *Shaw* elements against Warden Hamilton or Regional Administrator Manis and, thus, Muhammad has not alleged a cognizable supervisory liability claim against either defendant. Neither Hamilton nor Manis are medical professionals, and they must rely on the judgment of Keen Mountain's medical staff in determining and treating an inmate's medical needs. In this case, Hamilton and Manis relied on RN Whited's representation that Muhammad's new frames were ordered, VCE Optical sent the wrong sized frames, and Muhammad had been scheduled to see the eye doctor for an examination to obtain new measurements for a new pair of eyeglasses. Warden Hamilton specifically states that the information provided from the medical department "clearly demonstrated [to him] that they had the issue under control and were aware of the issues with Muhammad's glasses." (Hamilton Aff. ¶ 7.)  Based on the record, the court cannot conclude that Warden Hamilton or Regional Administrator Hamilton were deliberately indifferent to, or tacitly authorized, the delay in providing Muhammad's eyeglasses.

## IV.

Muhammad argues that Specialist Smith was deliberately indifferent to his serious medical need for prescription eyeglasses.[11] The court concludes, however, that Muhammad has not established that Smith was deliberately indifferent to a serious medical need and, therefore, the court will grant summary judgment to Smith.

The government is required to provide medical care for incarcerated individuals, but not "every claim by a prisoner [alleging] that he has not received adequate medical treatment states a violation of the [Constitution]." *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). To establish a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must put forth facts sufficient to demonstrate that an official was deliberately indifferent to a serious medical need. *Id.* at 105; *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (internal quotation marks omitted). A prison official is "deliberately indifferent" only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (U.S. 1994).

"[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. An "error of judgment" on the part of prison medical staff or "inadvertent failure to provide adequate medical care," while perhaps

---

[11] Specialist Smith concedes that she was responsible for ordering the eyeglasses and that she works in the medical department; the court will therefore treat her as medical staff for purposes of its analysis.

sufficient to support an action for malpractice, does not constitute a constitutional deprivation redressable under § 1983. *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989). Mere negligence does not constitute deliberate indifference; rather, a prison official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists and must draw the inference. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *see also Farmer*, 511 U.S. at 837. The prison official's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Militier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Further, "prisoners do not have a constitutional right to the treatment of his or her choice." *King v. United States*, 536 F. App'x 358, 362−63 (4th Cir. 2013) (unpublished) (internal citations omitted). A claim concerning a mere disagreement between an inmate and medical personnel regarding diagnosis or course of treatment does not implicate the Eighth Amendment. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990). Questions of medical judgment are not subject to judicial review. *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

To be sure, intentional delay of, or interference with, medical treatment can amount to deliberate indifference, *see Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006), but the Fourth Circuit has held that there is "no Eighth Amendment violation unless 'the delay results in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of

severe pain,'" *Formica*, 739 F. App'x at 755 (citing *Webb v. Hamidullah*, 281 F. App'x 159, 166-67 (4th Cir. 2008)); *see also Shame v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (internal quotation marks omitted)). Substantial harm may also be "'a lifelong handicap or permanent loss.'" *Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (quoting *Monmouth Co. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* at 758 (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)) (emphasis added).

Here, the evidence establishes that Muhammad submitted his damaged eyeglasses, wrapped in a paper form, to be repaired by the medical department on July 28, 2021. Specialist Smith received Muhammad's eyeglasses with broken frames on an unknown date, sometime after July 28. Smith ordered new frames for Muhammad's "old" lenses on October 8, 2021. The new frames arrived in early November, but the old lenses would not fit into the new frames. Muhammad was notified of the issue and was scheduled to see the eye doctor to check his prescription and measurements so that a new pair of eyeglasses (lenses and frames) could be ordered. Muhammad was seen by the eye doctor in February 2022, the next date the eye doctor visited Keen Mountain, and Muhammad's new eyeglasses (lenses and frames) were ordered that day. Muhammad's new eyeglasses arrived at Keen Mountain on March 10, 2022, and Specialist Smith gave them to the pill-call nurse to be delivered to Muhammad. For unknown reasons, the eyeglasses were not delivered that day, but as soon as Smith discovered the issue, she personally delivered them to Muhammad.

The record is clear that there was a relatively significant delay from the time Muhammad turned over his eyeglasses (July 2021) until the time he finally received his new eyeglasses (April 2022). But the record does not demonstrate that Specialist Smith acted with deliberate indifference in obtaining the new eyeglasses. Upon learning that Muhammad needed new eyeglass frames, Smith ordered them. The delay in waiting for the new frames to arrive from the approved vendor, although unfortunate, is not attributable to Smith. When the new frames arrived and the old lenses would not fit in them, Smith scheduled Muhammad to be seen by the eye doctor at the doctor's next visit to Keen Mountain. That the eye doctor was not able to visit Keen Mountain until February, whether due to COVID-19 or other DOC scheduling issues, is not attributable to Smith.

After Muhammad saw the eye doctor and received a new prescription, the new eyeglasses were ordered the same day. The delay in waiting for the new eyeglasses to arrive from VCE Optical is not attributable to Smith.

After the new frames arrived at Keen Mountain, Smith immediately gave them to a nurse to be delivered to Muhammad. That they were not delivered that day is not attributable to Smith. As soon as Smith learned that the new eyeglasses had not been provided to Muhammad, she had him brought to the medical department and delivered them to him herself. In addition, while they were waiting for the correct eyeglasses to arrive at Keen Mountain, Smith responded to several of Muhammad's written requests by updating him as to the status of his replacement eyeglasses. (*See* ECF No. 71-3 at 1, 2, 10, & 16.) Based on the record, the court cannot conclude that Smith intentionally delayed or interfered with

Muhammad receiving his eyeglasses or that she was deliberately indifferent to Muhammad's need for eyeglasses.[12] She is therefore entitled to summary judgment.

## V.

For the reasons stated, the court will grant the defendants' motion for summary judgment.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 25th day of September, 2023.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[12] To the extent that Muhammad claims that Specialist Smith, or any other defendant, failed to follow VDOC Operating Procedures or prison policies, his claim fails. It is well-settled that "a prison-policy violation that does not result in a constitutional violation does not create a viable claim under section 1983." *Watkins v. Davis*, No. 5:21-CT-3178-D, 2021 WL 6010350, at *3 (E.D.N.C. Dec. 20, 2021) (citing *Danser v. Stansberry*, 772 F.3d 340, 348–49 (4th Cir. 2014)).